UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:11-CV-94-F

| | | |
|---|---|---|
| CHARLES BOSWELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | O R D E R |
| | ) | |
| OFFICER KENNETH BULLOCK, | ) | |
| individually and in his capacity as an | ) | |
| officer of the City of Oxford Police | ) | |
| Department; and CHIEF OF POLICE | ) | |
| JOHN WOLFORD, individually and in his | ) | |
| capacity as Chief of the City of Oxford | ) | |
| Police Department and the CITY OF | ) | |
| OXFORD, NORTH CAROLINA, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court upon the Motion for Summary Judgment [DE-27] filed by

Defendants Officer Kenneth Bullock, Chief of Police John Wolford, and the City of Oxford,

North Carolina. The motion has been thoroughly briefed and is ripe for ruling. For the following

reasons, Defendants' Motion for Summary Judgment [DE-27] is ALLOWED IN PART and

DENIED IN PART.

## I. PROCEDURAL HISTORY

Plaintiff Charles Boswell initiated this action by filing a Complaint [DE-1][1] in this court

on March 3, 2011, alleging he was subjected to excessive force by Kenneth Bullock ("Officer

Bullock"), a police officer employed by the City of Oxford. Plaintiff alleges two claims against

---

[1] After receiving a Notice of Deficiency from the Clerk of Court on March 4, 2011,
Plaintiff filed a dated Complaint [DE-3] on that same day. The court will cite to the dated
Complaint [DE-3] in this order.

Officer Bullock, individually, for excessive force in violation of Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983. Plaintiff also alleges the City of Oxford is liable to him pursuant to 42 U.S.C. § 1983 for the violation of his constitutional rights. Additionally, Plaintiff alleges state tort claims against Officer Bullock and the City of Oxford.

Defendants moved for summary judgment [DE-27] on all claims against them on March 28, 2012. Plaintiff's response to the motion for summary judgment was therefore due under the applicable federal and local rules on or before April 21, 2012. *See* Local Civil Rule 5.1(e)(1)(providing that responses to non-discovery motions "shall be filed within twenty-one (21) days after service of the motion"); FED.R.CIV. P. 6(d) (allowing for 3 days to be added to a service period). Plaintiff, however, filed his first response [DE-30], consisting largely of exhibits, on April 28, 2012. Plaintiff thereafter filed a memorandum of law [DE-31] in support of his opposition on May 2, 2012. Defendants timely filed their reply [DE-33] on May 15, 2012.[2]

## II. STATEMENT OF THE FACTS

The facts, stated in the light most favorable to Plaintiff, are as follows.

### A. Plaintiff's first encounter with Officer Bullock

On January 23, 2009, at approximately 12:45 a.m., Plaintiff arrived in Oxford, North Carolina, driving his tractor-trailer truck. Plaintiff was in route from Dallas, Texas, and had been traveling for two days. Dep. of Charles Boswell [DE-27-8] at pp. 62-71. He parked his tractor-

---

[2]    Given Plaintiff's responses were untimely under the applicable Federal and Local Civil Rules and Plaintiff did not move for leave to file his responses out of time, nor offer any explanation for his untimely filing of his responses, the court declines to consider the Plaintiff's responses, and exhibits attached thereto, in ruling on Defendant's motion for summary judgment.

trailer on Industry Drive, or "the Loop," an area where he had regularly parked over the previous four to five years. *Id.* at pp. 131-32. Plaintiff sat in his vehicle and completed his work log book; while he was doing so, a police officer drove by his truck in a patrol car. *Id.* at p. 74.

Plaintiff then exited his vehicle and began to walk to his fiancé's residence at the Oakridge Apartments, located somewhere between a half-mile and a mile away. *Id.* at p. 75. After he walked past a building housing a furniture business, he started to walk through a field. *Id.* at p. 80. He then got back onto a street, and walked by an unemployment office and Betts Funeral Home. *Id.* at pp. 80-81. He started to walk towards a second field which had a gravel portion when he heard a car behind him. *Id.* at p. 82. Plaintiff continued to walk, and the car pulled up close to him, and he heard a voice ask, "hey man, where are you going?" *Id.* at pp. 83-84. Plaintiff didn't respond because the speaker did not address him as "sir." *Id.* at p. 84.

The car, which was a police patrol car, then pulled in front of Plaintiff, and Officer Bullock exited the vehicle. *Id.* Plaintiff continued to walk, and Officer Bullock told him if he didn't stop walking, he would shoot. *Id.* at p. 85. Plaintiff then stopped, and Officer Bullock asked him for his name, and asked where Plaintiff was going. *Id.* at p. 87. Officer Bullock told Plaintiff if he didn't answer him, he would be placed under arrest. *Id.* Plaintiff testified in his deposition that he responded as follows:

> I said I'm Charles Boswell. I said you just saw me get out of that tractor trailer. I said sir, you looked at me when I got out. I said now you're down here arresting me. He said what tractor trailer. I said I just saw you when you passed by me getting out of the tractor trailer. So, I said sir, my name is Charles Boswell, again. I'm going to my old lady's house right over here. I said if that's all you got sir, I'm gone.

*Id.* Plaintiff then turned, and attempted to jump a ditch, but felt Officer Bullock pull on his

3

sweatshirt. *Id.* at p. 88.

Plaintiff asked Officer Bullock what he was doing, and Officer Bullock replied that he was placing Plaintiff under arrest. *Id.* When Plaintiff asked why he was being arrested, Officer Bullock said for disturbing the peace. *Id.* Plaintiff said, "what" and Officer Bullock told Plaintiff he was talking loudly. *Id.* Officer Bullock instructed Plaintiff to place his hands behind his back, but Plaintiff didn't trust him, so he ran to his fiancé's apartment. *Id.* at pp. 88, 91.

Officer Bullock maintains, and Plaintiff now concedes, that he was not the police officer who drove by Plaintiff's tractor trailer. Officer Bullock contends he stopped Plaintiff because there had been recent reports of break-ins in the area, and he found it suspicious that Plaintiff was out walking so late on such a cold night. Bullock Aff. [DE-27-2] ¶¶ 2-5. Officer Bullock contends Plaintiff immediately became agitated and hostile when Officer Bullock asked for his name and what he was doing. *Id.* ¶ 6. He claims Plaintiff cursed at him and accused him of harassing him. *Id.* Officer Bullock also maintains that when he asked Plaintiff for identification, Plaintiff did not respond and instead ran away. *Id.* Officer Bullock then radioed that he was in a foot pursuit. He contends that during the course of the foot chase, he briefly caught up with Plaintiff and was able to grab his shirt, but Plaintiff took a swing at him and kept running. *Id.* ¶ 9. Officer Bullock observed him run in the direction of the Oak Ridge Apartments. *Id.*

**B. Plaintiff's second encounter with Officer Bullock**

When Plaintiff reached his fiancé's apartment, he told her what happened and said she needed to take him to the police station. Dep. of Charles Boswell [DE-27-8] at pp. 90-91. While his fiancé got ready, Plaintiff called 911 and asked to speak to someone at the police department. *Id.* at p. 92. Plaintiff then told the answering officer his name, and that he had just had a run-in

4

with another officer. *Id.* at p. 93. The answering officer told Plaintiff he had just heard about the

incident, and that Plaintiff was going to have charges pressed against him. *Id.* Plaintiff asked

what he did, and the answering officer replied that he wasn't there, so he could not say. *Id.*

Plaintiff then informed the answering officer that he would be at the police department in 10 to

15 minutes. *Id.* Plaintiff's fiancé then drove Plaintiff in the direction of the police department.

Meanwhile, Officer Bullock was picked up by Officer Scott Chabotte, who had responded

to his earlier call for assistance. Bullock Aff. [DE-27-2] ¶ 10. Officer Chabotte drove Officer

Bullock to his car, where Officer Bullock continued to check out Betts Funeral Home and the

surrounding area. *Id.* While he was doing this, Officer Chabotte radioed Officer Bullock that a

car was leaving Oak Ridge Apartments, and that dispatch had informed him that a man had

called the police department and reported that he had been involved in a chase with a police

officer and was on his way to turn himself in. *Id.* Both Officer Bullock and Officer Chabotte

were skeptical that a man who had just run from police would voluntarily turn himself in. *Id.*

Officer Bullock then began to follow the vehicle leaving Oak Ridge Apartments, after

having activated the video camera in his patrol car. *Id.*, Exhibit D (recording manually filed with

the court). He initiated a stop of the vehicle, and saw that Plaintiff was riding in the passenger

seat. *Id.* ¶ 12. Officer Bullock maintains that his leg was hurt from falling on ice during the

preceding chase, and that he was concerned for his safety. *Id.* ¶ 12. The video, which does not

have sound, shows the following:

- As Officer Bullock approaches the passenger side of the vehicle, he is limping, and has both a flashlight and a taser[3] in his hands.

---

[3] The record indicates that the City of Oxford utilizes the X26 Advanced Taser Gun. *See* [DE-27-7]. The Ninth Circuit Court of Appeals described the X26 as follows:

- Officer Bullock pauses by the passenger side door for approximately four seconds.
- He then faces the passenger side door head on, and points the taser directly at the car.
- Plaintiff then opens the door. Officer Bullock's arm is extended so close to the vehicle that when Plaintiff opens the door, it knocks the taser.
- Plaintiff exits the car; as soon as he stands up, Officer Bullock deploys the taser on Plaintiff.
- Once on the ground, Plaintiff appears to be talking to Officer Bullock. He then places his hands behind his back, and Officer Bullock handcuffs him.

Bullock Aff. [DE-27-2], Exhibit D.

Plaintiff and Officer Bullock have differing accounts on what was said during the traffic stop. Plaintiff contends that he and his fiancé were looking for an officer to appear on the driver's side of the car; when one didn't, his fiancé looked out the passenger side and saw an officer there. Dep. of Charles Boswell [DE-27-8] at pp. 95-96. She rolled down the window, and told Officer Bullock they had just called 911, and were on their way to the police department. *Id.* at p. 96. According to Plaintiff, Officer Bullock instructed Plaintiff to get out of the car, and Plaintiff complied. *Id.*

Officer Bullock, however, states that he immediately asked Plaintiff to exit the vehicle,

---

The X26 uses compressed nitrogen to propel a pair of "probes"—aluminum darts tipped with stainless steel barbs connected to the X26 by insulated wires—toward the target at a rate of over 160 feet per second. Upon striking a person, the X26 delivers a 1200 volt, low ampere electrical charge through the wires and probes and into his muscles. The impact is as powerful as it is swift. The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless. The tasered person also experiences an excruciating pain that radiates throughout the body.

*Bryan v. MacPherson*, 630 F.3d 805, 824 (9th Cir. 2010)(internal citations and footnotes omitted).

6

but Plaintiff did not obey, and instead stated, "for what." Bullock Aff. [DE-27-2] ¶ 13. Officer Bullock claims he had to ask Plaintiff more than once to exit the car. *Id.* He maintains that he displayed his taser while asking Plaintiff to get out of the car because Plaintiff had previously acted aggressively towards him and ran from him. *Id.* Officer Bullock characterizes the manner in which Plaintiff exited the vehicle as "aggressive and threatening." *Id.* ¶ 14. He felt that Plaintiff, as he exited the car, was "squaring off with his chest as if he wanted to fight" and noted that the door to the car almost hit him when Plaintiff opened it. *Id.* Officer Bullock contends he thought Plaintiff was going to fight, and he was concerned for his safety because of his leg injury. *Id.* Because he felt Plaintiff constituted a threat, he deployed the taser. *Id.* Officer Chabotte (who arrived after Officer Bullock stopped the vehicle) was on the driver's side of the vehicle during this exchange and, stated he felt the situation was "tense." Chabotte Aff. [DE-27-4] ¶ 4.

Officer Bullock states that once Plaintiff was on the ground, he deployed a taser a second time because Plaintiff had refused to comply with Bullock's directive to place his hands behind his back. Bullock Aff. [DE-27-2] ¶ 15. Plaintiff does not have a recollection of how many times he was tasered, but does remember yelling "where you want my hands at" right after he hit the ground. Dep. of Charles Boswell [DE-27-8] at pp. 101-04.

Plaintiff contends that after he was handcuffed by Officer Bullock and helped to his feet by Officer Chabotte, Officer Bullock told him he had hurt his leg running after Plaintiff, and he was going to make sure Plaintiff received the highest bond he could. *Id.* at pp. 104-05. Plaintiff contends that when he arrived at the police department, he asked Officer Bullock why he shot him with the taser, and Officer Bullock answered: "I hurt my leg and I wasn't going to run at you any more, and that was it." *Id.* at p. 108.

7

## C. Plaintiff's Arrest and Conviction

Once at the police department, Plaintiff was charged with resisting, delaying or obstructing an officer. Bullock Aff. [DE-27-2] ¶ 18; Ex. A (arrest report); Ex. B (arrest warrant). After a trial in North Carolina district court, the district judge found him guilty. Dep. of Charles Boswell [DE-27-8] at p. 111. The parties agree that the witnesses, which included Plaintiff and Officer Bullock, testified to both the first and second encounters between the two gentlemen. *Id.* at pp. 111-113. Plaintiff did not appeal his conviction. *Id* at p. 113.

## III. STANDARD OF REVIEW

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden initially of coming forward and demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When making the summary judgment determination, the facts and all reasonable inferences must be viewed in the light most favorable to the non-movant. *Liberty Lobby*, 477 U.S. at 255. Once the moving party has met its burden, the non-moving party then must come forward and demonstrate that such a fact issue does indeed exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish any one of the essential elements of the party's claim on which he will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322-23.

When a party has failed to respond to a summary judgment motion, the court may grant

8

summary judgment only "if appropriate." FED. R. CIV. P. 56(e)(2). To determine if it is

appropriate, the district court must review the record to determine whether the movant is entitled

to summary judgment. *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993).

("Although the failure of a party to respond to a summary judgment motion may leave

uncontroverted those facts established by the motion, the moving party must still show that the

uncontroverted facts entitle the party to 'a judgment as a matter of law.' "). Consequently,

although the court will not consider Plaintiff's responses to Defendants' motion for summary

judgment, it still will review the record to determine whether (1) there is no genuine issue of

material fact, and (2) the Defendants are entitled to judgment as a matter of law.

## IV. ANALYSIS

Defendants move for summary judgment arguing: (1) Plaintiff's conviction for resisting

precludes him from pursuing § 1983 excessive force claims against Officer Bullock; (2) Officer

Bullock is entitled to qualified immunity for Plaintiff's § 1983 claims; (3) Officer Bullock is

entitled to judgment because his use of force was justified and objectionably reasonable as a

matter of law; (4) Plaintiff's § 1983 municipal liability claims are insufficient as a matter of law;

(5) Officer Bullock is entitled to public official immunity for Plaintiff's state law tort claims; (6)

Plaintiff has proffered insufficient evidence to prevail on his state law tort claims, and (7)

Plaintiff's claim for punitive damages fails. The court will address these arguments in turn.

### A. Plaintiff's excessive force claims are not barred by his conviction for resisting arrest

Defendants first contend that Plaintiff's § 1983 claims against Officer Bullock for

excessive force are barred, as a matter of law, by his conviction for resisting an officer, under the

Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994). Specifically, Defendants

9

contend that because the North Carolina district court heard evidence of both the first and second encounters between Plaintiff and Officer Bullock, and Plaintiff was convicted of resisting an officer, his excessive force claims constitute a collateral attack on his convictions under *Heck*. The court does not agree.

In *Heck*, the Supreme Court held that a plaintiff's § 1983 claim is barred if it is clear from the record that its success would necessarily imply that the plaintiff's early conviction was invalid. 512 U.S. at 486-87 ("Thus, when a [plaintiff] seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidation of his conviction or sentence; if it would, the complaint must be dismissed."). This rule is intended to prevent collateral attack on a criminal conviction through the vehicle of a civil suit. *Id.* at 484-86. A person convicted of resisting arrest, however, is not *per se* barred from bringing a § 1983 action for excessive force arising from the same interaction, as long as success on the § 1983 action does not undermine the validity of the criminal conviction. *See Riddick v. Lott*, No. 05-7882, 202 Fed. Appx. 615, 616-17 (4th Cir. 2006)(unpublished)(per curiam)(vacating district court's dismissal of § 1983 excessive force claim on *Heck* grounds because the sparse record did not allow a court to determine whether the claimed police brutality would necessarily imply the invalidity of the plaintiff's earlier conviction for assaulting an officer while resisting arrest).

Accordingly, to properly apply *Heck*, a court must first analyze the relationship between the plaintiff's § 1983 claim and the charge on which he was convicted. *Heck*, 512 U.S. at 486-87. *See also Riddick*, 202 Fed. Appx. at 616 ("The *Heck* analysis requires a close factual examination of the underlying conviction."). In this case, Plaintiff claims Officer Bullock

subjected him to excessive force when Officer Bullock fired the taser at him when Plaintiff exited his fiance's vehicle and when Officer Bullock fired the taser at Plaintiff while he lay on the ground. These claims do not necessarily imply the invalidity of Plaintiff's conviction.

Neither Defendants nor Plaintiff directly cite to the statute setting forth the crime of which Plaintiff was convicted. The record, however, shows that Plaintiff was arrested for unlawfully and willfully resisting, delaying, or obstructing a public officer. *See* Bullock Aff. [DE-27-2] Ex. B (Magistrate's Order). The court's own review of the North Carolina General Statutes leads it to conclude that Plaintiff was convicted of N.C. Gen. Stat. § 14-223, which provides: "If any person shall willfully and unlawfully resist, delay, or obstruct a public officer in discharging or attempting to discharge a duty of his office, he shall be guilty of a Class 2 misdemeanor." As Plaintiff's deposition testimony and Officer Bullock's affidavit make clear, the district judge heard evidence of both encounters between Plaintiff and Officer Bullock: the first encounter, in the field, and the second encounter, during the traffic stop. If the district judge believed Officer Bullock's version of the first encounter–that Plaintiff ignored Officer Bullock's instructions to stop running, and "took a swing" at him–that alone would be enough to sustain the conviction for resisting, delaying or obstructing a police officer. *See State v. Sinclair*, 191 N.C. App. 485, 488-89, 663 S.E.2d 866, 870 (2008)(listing the elements of N.C. Gen. Stat. § 14-223 as "1) the victim was a public officer; 2) that the defendant knew or had reasonable grounds to believe that the victim was a public officer; 3) that the victim was discharging or attempting to discharge a duty of his office; 4) that the defendant resisted, delayed, or obstructed the victim in discharging or attempting to discharge a duty of his office; and 5) that the defendant acted willfully and unlawfully, that is intentionally and without justification or excuse"). *See also*

11

Bullock Aff. [DE-27-2] Ex. B (Magistrate's Order)(finding Plaintiff's arrest without a warrant to be justified because there was probable cause to believe that Plaintiff "unlawfully and willfully did resist, delay and obstruct K. Bullock, a public officer holding the office of PATROL OFFICER, by NOT STOPPING WHEN ORDERED TO BY OFFICER BULLOCK. At the time, the officer was discharging or attempting to discharge a duty of his office, CHECKING ON A SUSPICIOUS PERSON NEAR A BUSINESS WHICH HAD BEEN BROKEN INTO."). The evidence of Plaintiff's second encounter with Officer Bullock would not be necessary to support the conviction.

In the court's view, Officer Bullock's firing of his taser during the second encounter is distinct, for purposes of applying the *Heck* rule, from the first encounter in the field. *See Riddick*, 202 Fed. Appx. at 617 (explaining that a plaintiff's conviction for resisting arrest may coexist with a finding that the officer's alleged attack was unprovoked and occurred independently of the plaintiff's own resistance). Given that there is no indication in the record whether the North Carolina state district court based its conviction on Plaintiff's actions in the first encounter, second encounter, or both, the court cannot find that Plaintiff's excessive force claims–which only concern Officer Bullock's actions in the second encounter–necessarily imply that Plaintiff's conviction is invalid. Moreover, a "state court's finding that [a plaintiff] resisted a lawful arrest . . . may coexist with a finding that the police officer's used excessive force to subdue him . . . [because] a jury could find that the police officers effectuated a lawful arrest of [the plaintiff] in an unlawful manner." *Martinez v. City of Alburquerque*, 184 F.3d 1123, 1127 (10th Cir. 1999), cited with approval in *Riddick*, 202 Fed. Appx. at 617. *See also VanGilder v. Baker*, 435 F.3d 689, 692 (7th Cir. 2006)(explaining that a plaintiff alleging excessive force "does not collaterally

attack his conviction [or] deny that he resisted . . . . [but] [r]ather . . . claims that he suffered

unnecessary injuries because [the] response to his resistance . . . was not . . . objectively

reasonable"); *Hooper v. Cnty of San Diego*, 629 F.3d 1127, 1133 (9th Cir. 2011)(collecting cases

from the First, Third, Fifth, Seventh, and Eleventh Circuit Courts of Appeals). Accordingly, the

court finds that *Heck* does not bar Plaintiff's § 1983 excessive force claims against Defendant

Bullock.

**B.      Officer Bullock is not entitled to summary judgment on Plaintiff's §1983 claim
against him in his individual capacity**

Defendants also contend that Officer Bullock is entitled to judgment on Plaintiff's § 1983

excessive force claim against him in his individual capacity, raising a two-pronged argument.

First, Defendants contend that Officer Bullock's use of the taser was objectively reasonable as a

matter of law, and therefore no constitutional violation occurred. Second, Defendants contend

that Officer Bullock is entitled to qualified immunity.

Defendants' arguments merge the issue of the viability of Plaintiff's § 1983 excessive

force claim with the issue of whether Officer Bullock enjoys qualified immunity for his actions.

Qualified immunity shields governmental officials from money damages "insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800. 818 (1982). To

determine whether a governmental official is entitled to qualified immunity, the court must

answer two questions. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Doe ex rel. Johnson v.
S.C. Dep't of Soc. Servs.,* 597 F.3d 163, 169 (4th Cir.2010). First, "whether the facts that a

plaintiff has . . . shown . . . make out a violation of a constitutional right." *Pearson*, 555 U.S. at

232. Second, "whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Id.* This court has the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Id.* at 236. Given that Officer Bullock's first argument–his actions were reasonable as a matter of law–overlaps with the first prong of the qualified immunity analysis, the court, in its discretion, will address the constitutional violation prong first.

### 1. Plaintiff has proffered sufficient evidence to show that his Fourth Amendment rights were violated

A claim of excessive force by a law enforcement officer implicates the constitutional rights of an individual to be free from unreasonable search and seizure under the Fourth Amendment. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011)("The Fourth Amendment's prohibition on unreasonable seizures includes the right to be free of 'seizures effectuated by excessive force.'"). "Whether an officer has used excessive force is analyzed under a standard of objective reasonableness," *id.*, and the court does not consider the officer's underlying intent or motivation. *Graham v. Connor*, 490 U.S. 386, 397 (1989)(explaining that courts determine "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation"). The question, at bottom, "is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996). *See also Tennessee v. Garner*, 471 U.S. 1, 9-10 (explaining the question is "whether the totality of the circumstances justified a particular . . . seizure").

This objective standard is "not capable of precise definition or mechanical application,"

14

*Bell v. Wolfish*, 441 U.S. 520, 559 (1979), but instead "requires careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396. In applying this objective standard, the court must "weigh 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.' " *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003)(quoting *Graham*, 490 U.S. at 396). The relevant facts and circumstances include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting seizure or attempting to evade seizure by flight." *Graham*, 490 U.S. at396. The court may also consider the extent of the plaintiff's injury. *Jones*, 325 F.3d at 527. In undertaking this analysis, the court must remain cognizant that "a particular use of force must be judged from the perspective of a reasonable officer on the scene" and not viewed through the lens of "20/20 hindsight." *Graham*, 490 U.S. at 396.

Taking the facts in the light most favorable to the Plaintiff, the court cannot say that Officer Bullock's use of the taser was objectively reasonable as a matter of law. The court recognizes that the first *Graham* factor–the severity of the underlying offense–does not weigh in Plaintiff's favor. In the Fourth Circuit, courts are concerned with "the existence of criminal activity rather than the extent of harm caused by that activity." *Valladares v. Cordero*, No. 1:06cv1378, 2007 WL 2471067, at * 3 (E.D.Va. Aug. 27, 2007), *aff'd*, 552 F.3d 384 (4th Cir. 2009). Here, Plaintiff did flee from Officer Bullock when, under Plaintiff's version of the facts, Officer Bullock attempted to place him under arrest in the field. This a crime under North Carolina, *see* N.C. Gen. Stat. § 14-223, and accordingly, the court cannot find that this factor weighs in Plaintiff's favor.

15

The second and third *Graham* factors, however, do weigh in Plaintiff's favor. Plaintiff cannot be said to have been "actively resisting seizure or evading seizure by flight" at the time Officer Bullock first used the taser. *Graham*, 490 U.S. at 396. Although Plaintiff previously had resisted Officer Bullock's attempt to arrest him in the field, at the time Officer Bullock first used the taser, Plaintiff was not *then* resisting arrest. *Cf. Parker v. Gerrish*, 547 F.3d 1, 10 (1st. Cir. 2008)(noting that just because an arrestee had "earlier harassed or resisted the officers does not justify the later use of the Taser"). Crediting Plaintiff's version of the facts–which the court must do when considering Defendants' motion for summary judgment–Officer Bullock instructed Plaintiff one time to exit the car. Plaintiff did so, and Officer Bullock immediately deployed the taser upon Plaintiff. In other words, Officer Bullock deployed the taser without a verbal warning despite the fact that Plaintiff was complying with his express instruction. *Fils v. City of Aventura*, 647 F.3d 1272, 1289-90 (11th Cir. 2011)(determining that officers' use of a taser against a non-violent plaintiff who did not disobey orders or pose a risk to the officers was excessive); *Parker*, 547 F.3d at 9-10 (concluding that a jury could find a police officer's tasering of an arrestee to be excessive where arrestee voluntarily released his hands for cuffing after just a few seconds of resistance).

Nor can the court find that Plaintiff's action in exiting the car–at the specific behest of Officer Bullock–constituted a threat or resistance[4] to Officer Bullock. *See Graham*, 490 U.S. at

---

[4] Defendants repeatedly note that Plaintiff was "convicted of resisting." As this court previously has observed, it appears that Plaintiff was convicted of resisting, delaying, or obstructing a public officer. As this court also has previously observed, the events in the field during the first encounter between Plaintiff and Officer Bullock could support the conviction. Accordingly, the court does not assume that Plaintiff's conviction for "resisting" was based on events during the second encounter, where the tasings took place.

396 (explaining that one of the factors to be examined is whether the suspect poses an immediate threat to an officer or others). Officer Bullock makes much of the fact that the car door almost hit him when Plaintiff opened it, and contends that Plaintiff exited the car in an "aggressive and threatening manner" and "appeared to be . . . squaring off with his chest as if he wanted to fight me." Bullock Aff. [DE-27-2] ¶ 14. The video, however, reveals that it is not surprising that the car door almost touched Officer Bullock; he was standing with his arm extended such that the taser and his hand were within what looks to be one foot of the car door. It was not reasonable, then, to perceive the closeness of the car door upon opening as a threat, especially when Officer Bullock was not alone on the scene.[5] Moreover, the video does not support Officer Bullock's recollection that Plaintiff "squared off" toward him. Rather, Plaintiff exited the vehicle while looking at Officer Bullock. Officer Bullock then deployed the taser immediately after Plaintiff's exit. Under these circumstances, a reasonable jury could find that Officer Bullock's first use of the taser constitutes excessive force. *See Brown v. City of Golden Valley*, 574 F.3d 491, 498 (8th Cir. 2009)(denying qualified immunity to an officer who used a taser on a passenger who refused to terminate a 911 call to an operator during a traffic stop because "whether [the officer] reasonably interpreted her refusal as a realistic threat to his personal safety or whether it constituted nothing more than an affront to his command authority is a matter for a jury to decide").

Moreover, the court cannot say that Officer Bullock's second use of the taser was objectively reasonable as a matter of law. Again, under Plaintiff's version of the facts, after he

---

[5] In this manner, this case differs from a case cited by Defendants, *Brown v. Gilmore*, 278 F.3d 362 (4th Cir. 2002), because Officer Bullock's perception was not reasonable.

fell to the ground, he yelled "where do you want my hands at." Dep. of Charles Boswell [DE-27-8] at p. 101. It is not apparent how this action could be interpreted as either resistance or a threat to Officer Bullock, especially when Officer Chabotte also was present. *See Parker*, 547 F.3d at 9-10 (remarking that the fact that the plaintiff "was earlier insolent or frustrated" does not mean the jury could not find the plaintiff did not constitute threat or presented meaningful resistance). Accordingly, the court finds that Plaintiff has proffered sufficient evidence from which a reasonable jury could conclude that Officer Bullock's use of the taser against Plaintiff was excessive.

### 2. Plaintiff's right to be free from excessive force was clearly established

Officer Bullock contends that even if Plaintiff can proffer sufficient evidence to show a constitutional violation, he is still entitled to qualified immunity on Plaintiff's excessive force claims. Officer Bullock bears the burden of persuasion as to this affirmative defense, *see Henry v. Purnell*, 501 F.3d 374, 378 (4th Cir. 2007), and must show that Plaintiff's right to be free from excessive force, under the facts of this case, was not clearly established at the time of Plaintiff's arrest. *Pearson*, 555 U.S. at 232.

"For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)(internal quotations omitted). When considering whether a constitutional right is "clearly established," a court must "define the right in light of the specific context of the case, (I verified comma is part of quote) not as a broad general proposition. . . . that is, whether it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he encountered." *Lefemine v. Wideman*, 672 F.3d 292, 298

18

(4th Cir. 2012). In making the determination, a court may consider decisions from the United States Supreme Court, the Fourth Circuit, and highest court of the state in which the incident took place. *Id.* at 299-300.

Accordingly, this court must examine whether, in January 2009, it was clear to a reasonable officer that it was unlawful to deploy a taser upon a suspect who was no longer resisting arrest and was complying with the officer's express directive. The answer is undoubtedly yes. Although the Fourth Circuit only has addressed the use of a taser on one occasion,[6] it still was clear in 2009 that one has a right to be free from physical force–whether it be via a taser or otherwise–when one is not resisting the police. *Cf. Bailey v. Kennedy*, 349 F.3d 731, 744-45 (4th Cir. 2003)(noting that "[b]oth before and after November 1999, courts have consistently applied the *Graham* holding and have consistently held that officers using unnecessary, gratuitous, and disproportionate force . . . are not entitled to qualified immunity")[7]; *Rowland v. Perry*, 41 F.3d 167, (4th Cir. 1994)(denying qualified immunity on an excessive force claim where a police officer attacked a person suspected of taking a $5 bill from the floor even though the person may have initially resisted the officer's efforts to subdue him).

---

[6] In *Orem v. Rephann*, 523 F.3d 442 (4th Cir. 2008), the Fourth Circuit considered whether the use of a taser against an arrestee constituted excessive force in violation of the Due Process Clause of the Fourteenth Amendment. The Fourth Circuit determined that a jury could find that the defendant's use of the taser was unconstitutional where the arrestee was a 100-pound woman who already was restrained via a cage in the back of a patrol car and had a leg restraint, the defendant tased the arrestee under her left breast and on her inner thigh, and the defendant stated the arrestee needed to respect him. *Id.* at 444-447.

[7] The court recognizes in *Bailey* the excessive force continued after the plaintiff had been secured by law enforcement. Even though Plaintiff in this case was not handcuffed or otherwise secured, the court nevertheless finds that *Bailey* and other cases make it clear that a non-resisting and compliant citizen should not be subjected to "unnecessary, gratuitous, and disproportionate force." *Bailey*, 549 F.3d at 745.

19

Accordingly, Officer Bullock is not entitled to qualified immunity with regard to his first use of the taser.

Nor is he entitled to qualified immunity with regard to his subsequent use of the taser. Again, taking the facts in the light most favorable to Plaintiff, he was not resisting Officer Bullock's attempt to handcuff him, but rather was asking Officer Bullock where he should put his hands. Under the circumstances, it would be clear to a reasonable officer that using a taser against a citizen who is actively attempting to comply with the officer's directives is a violation of the citizen's Fourth Amendment rights. *Cf. Wilson v. Flynn*, 429 F.3d 465, 468-69 (4th Cir. 2005)(affirming district court's grant of summary judgment on the basis of qualified immunity where the suspect refused to present his hands to be handcuffed when asked to do so, and officers punched him and sprayed mace in his face). Officer Bullock is not entitled to qualified immunity for his subsequent use of the taser, and the Defendants' Motion for Summary Judgment [DE-27] as to Plaintiff's § 1983 claims against Officer Bullock in his individual capacity is DENIED.

## C. Plaintiff lacks sufficient evidence for his municipal liability claims

In addition to imposing liability on Officer Bullock in his individual capacity, Plaintiff also seeks to impose liability under § 1983 against the City of Oxford. Because local government units–like the City of Oxford– qualify as "persons" for the purposes of § 1983, they can be liable for damages when they deprive citizens of federal rights. *See Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 690-91 (1978). Moreover, a plaintiff's claim against a government official in his official capacity is treated as a claim against the government entity of which the official is an agent. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). Consequently, Plaintiff's claims against Officer Bullock and Chief of Police John Wolford[8] in their official capacities are in reality against the City of Oxford.

Although a local government entity may be held liable under § 1983, it is well settled that a local government entity cannot be held liable under § 1983 on a *respondeat superior* theory. *Monell*, 436 U.S. at 691. Rather, to establish liability of the entity, a plaintiff must show that: (1) a government actor deprived the plaintiff of her federal rights; and (2) the harm was the result of municipal policy or custom. *Id.* "This requirement limits municipal liability under section 1983 to those actions for which the municipality is actually responsible by distinguishing between acts attributable to the municipality and acts attributable only to municipal employees."

---

[8] Defendant Chief of Police John Wolford is named in the caption of the Complaint [DE-3], and designated as being sued in his individual and official capacities. He is not designated, however, as a defendant in any of Plaintiff's claims for relief, nor does the record reveal a basis for imposing liability upon him. Accordingly, Defendant's Motion for Summary Judgment [DE-27] is ALLOWED to the extent it seeks judgment on any claims against Defendant Chief of Police John Wolford.

*Hill v. Robeson County,* 733 F.Supp.2d 676, 683 (E.D.N.C. 2010)(citing *Bd. of County Comm'rs*

*of Bryan County v. Brown,* 520 U.S. 397, 403-04 (1997) and *Riddick v. Sch. Bd. of Portsmouth,*

238 F.3d 518, 523 (4th Cir. 2000)). As this court already has found, Plaintiff has proffered

sufficient evidence to show that Officer Bullock violated Plaintiff's rights. Accordingly,

Plaintiff's municipal liability claim may go forward if he proffers sufficient evidence of an

official policy or custom of the City of Oxford which led to the constitutional violation.

A policy or custom for which a local government entity may be held liable may arise in

four ways:

> (1) through an express policy, such as written ordinance or regulation; (2) through
> the decisions of a person with final policymaking authority; (3) through an
> omission, such as a failure to properly train officers, that "manifest[s] deliberate
> indifference to the rights of citizens"; or (4) through a practice that is so
> "persistent and widespread" as to constitute a "custom or usage with the force of
> law."

*Lytle v. Doyle,* 326 F.3d 463, 471 (4th Cir. 2003)(quoting *Carter v. Morris,* 164 F.3d 215, 218

(4th Cir. 1999)). Plaintiff fails to proffer sufficient evidence to establish the City of Oxford's

liability on any of these four grounds.

First, the record is devoid of evidence that an express policy of the City of Oxford led to

Officer Bullock violating Plaintiff's constitutional rights. The City of Oxford does have a written

policy governing the use of taser guns, but the policy does not contain any directives or

guidelines that can be interpreted as leading to a constitutional violation. *See* Oxford Police

Department Policy [DE-27-7]. Nor is there evidence that a final policymaker made a decision

which led to the violation of Plaintiff's constitutional rights.

The record also does not indicate that the City of Oxford engaged in a practice or custom

22

of condoning or encouraging the use of unconstitutional excessive force. A custom "may arise if a practice is so persistent and widespread and so permanent and well settled as to constitute a custom or usage with the force of law." *Carter*, 164 F.3d at 220. The record indicates that 38 individuals have been tased since the Oxford Police Department began using tasers in 2004. Wolford Aff. [DE-27-3] ¶ 4. No lawsuits, other than the present action, have been filed against the City of Oxford regarding the use of tasers, and the record suggests that only four citizen complaints have been made regarding the use of a taser. *See* Bullock Aff. [DE–27–2] ¶ 26 (stating he received verbal counseling concerning the use of deployment of a taser in 2005); Wolford Aff. [DE-27-3] ¶ 4 (noting tasing incidents involving two individuals which occurred in 2010). This evidence is insufficient to establish an unconstitutional custom or practice.

Finally, Plaintiff cannot show that the City of Oxford showed deliberate indifference to his rights. A broad reading of Plaintiff's Complaint suggests he contends that the City of Oxford failed to adequately train its officers in the use of tasers. To impose Section 1983 liability on the City of Oxford under a theory of deliberate indifference, however, Plaintiff must proffer evidence that a "municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Brown*, 520 U.S. at 411. "Deliberate indifference is a very high standard–a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999). *See also Jones v. Wellham*, 104 F.3d 620, 627 (4th Cir. 1997)(explaining that decisions taken by a policymaker may be "clearly unfortunate, might perhaps be thought imprudent, or even be found legally negligent, but that does not suffice; only decisions taken with deliberate indifference to the potential consequences of known risks suffices to impose municipal liability on the basis that such decisions constituted

23

official [municipal] 'policy' "). Deliberate indifference requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S.at 410. In this case, the record shows that the Oxford Police Department meets the State's mandated yearly training requirements regarding use of force and its officers are certified on a yearly basis to use tasers. Wolford Aff. [DE-27-3] ¶ 3. There is no evidence in the record suggesting that this training or supervision is deficient. Plaintiff, therefore, has failed to proffer any evidence supporting his claim for municipal liability under § 1983. Accordingly, Defendant's Motion for Summary Judgment [DE-27] is ALLOWED as to Plaintiff's Third Claim for Relief.

## D. State claims

Defendants also seek summary judgment on Plaintiff's claims under state law for assault, battery, gross negligence, and negligent failure to train. Defendants argue insufficient evidence exists to support the claims, or alternatively, that Officer Bullock is entitled to public official immunity for the claims against him.

### 1. Assault and Battery Claims

Under North Carolina law, "a civil action for damages for assault and battery is available at common law against one who, for the accomplishment of a legitimate purpose, such as justifiable arrest, uses force which is excessive under the given circumstances." *Myrick v. Cooley*, 91 N.C. App. 209, 215, 371 S.E.2d 492, 496 (1988). *See also Todd v. Creech*, 23 N.C. App. 537, 539 (1974)("While an officer in making an arrest and securing control of an offender has the right to use such force as may be reasonably necessary in the proper discharge of his duties, he may not act maliciously in the wanton abuse of his authority or use unnecessary or excessive force."). Where, as here, there is sufficient evidence to support a claim for excessive

24

force under § 1983, sufficient evidence also exists to support a claim for assault and battery under North Carolina law. *See Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994)("The parallel state law claim of assault and battery is subsumed within the federal excessive force claim and so goes forward as well.").

Public officers, like police officers, however, enjoy public official immunity under North Carolina law, which "protects public officials from individual liability for negligence in the performance of their governmental or discretionary duties. *Campbell v. Anderson*, 156 N.C.App. 371, 376, 576 S.E.2d 726, 730 (2003). Under this doctrine, "[p]ublic official cannot be held individually liable for damages caused by mere negligence in their performance of their governmental" duties, but rather are liable only where their actions were "corrupt or malicious, or . . . outside of and beyond the scope [of their] duties." *Meyer v. Walls*, 347 N.C. 97, 489 S.E.2d 880 (1997). "A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." *Grad v. Kaasa*, 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984). "'An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." *Id.* (quoting *Givens v. Sellers*, 273 N.C. 44, 50, 159 S.E.2d 530, 535 (1968)). In an unpublished opinion, the Fourth Circuit observed the following:

> When the definition of "wanton" is grafted into the definition of "malice," *Grad* established a three prong framework providing that malice, for the purposes of piercing the cloak of public officer's immunity, may be demonstrated by conduct (1) "when done needlessly, manifesting a reckless indifference to the rights of others," 321 S.E.2d at 890-91; (2) "which a [person] of reasonable intelligence would know to be contrary to [their] duty," *id.* at 890 and (3) "which [is] intend[ed] to be prejudicial or injurious to another." *Id.*

25

*Russ v. Causey*, No. 10-2016, 2012 WL 593560, at *6 (4th Cir. Feb. 24, 2012).

The court finds that, taking the facts in light most favorable to Plaintiff, there is sufficient evidence to create a genuine issue of material fact on the issue of public officer immunity. First, deploying a taser on a suspect who is complying, or obviously attempting to comply, with the officer's express directive is conduct which is "done needlessly" and manifests a reckless indifference to the rights of others. *Grad*, 312 N.C. at 313, 321 S.E.2d at 891. Second, a jury could find that an officer of reasonable intelligence would know that deploying a taser on such a suspect is contrary to his or her duty, because it is excessive force. Finally, Plaintiff has testified that after he was arrested, Officer Bullock told him, "I hurt my leg running at you, and I'm going to make sure you get the highest bond there is." Dep. of Charles Boswell [DE-27-8] at p. 105. A jury could infer from the timing and nature of the taser shooting, and this comment, that Officer Bullock was motivated by anger and frustration at Plaintiff when he deployed the taser. Accordingly, a genuine issue of material fact exists as to the issue of public officer immunity, and the assault and battery claims against Officer Bullock in his individual capacity will go forward.[9]

### 2. Negligent Supervision and Training

Plaintiff also alleges a claim for negligent supervision and failure to train against the City

_____

[9] Plaintiff also asserts claims for assault and battery against the City of Oxford on the basis of respondeat superior. Compl. [DE-3] at pp. 17-18. To the extent Plaintiff asserts the assault and battery claim against Officer Bullock in his official capacity, that claim also is against the City of Oxford. Compl. [DE-3] at p.1 (containing the caption which states Officer Bullock is being sued in his individual and official capacities); *Epps v. Duke Univ., Inc.*, 122 N.C. App. 198, 203 468 S.E.2d 846, 850 (2002) (explaining that a suit against a public officer in his official capacity "operates against the public entity itself, as the public entity is ultimately financially responsible for the compensable conduct of its officers"). Defendants do not argue that the assault and battery claims against the City of Oxford are subject to summary judgment.

of Oxford. "In North Carolina, a plaintiff must prove two elements to hold an employer liable for negligent supervision or retention: (1) that an incompetent employee committed a tortious act resulting in injury to the plaintiff, and (2) that prior to the act, the employer knew or had reason to know of the employee's incompetency." *Smith v. First Union Nat'l Bank,* 202 F.3d 234, 249–50 (4th Cir. 2000) (citing *Hogan v. Forsyth Country Club Co.,* 79 N.C. App. 483, 495, 340 S.E.2d 116, 124 (1986)). There is no suggestion in the record that the City of Oxford should have been aware of any incompetency on the part of Officer Bullock. Moreover, as this court previously observed in its discussion of Plaintiff's § 1983 municipal liability claim, the record is devoid of evidence suggesting that the City of Oxford was negligent in its supervision of its officers. Nor is there evidence the City of Oxford was negligent in its training of its officers. Accordingly, Defendant's Motion for Summary Judgment [DE-27] is ALLOWED as to Plaintiff's Sixth Claim for Relief.

### 3. Gross Negligence

Defendants also seek summary judgment on Plaintiff's claim for gross negligence against both Officer Bullock and the City of Oxford.

"Actionable negligence occurs when a defendant owing a duty fails to exercise the degree of care that a reasonable and prudent person would exercise under similar conditions, or where such a defendant of ordinary prudence would have foreseen that the plaintiff's injury was probable under the circumstances." *Martishius v. Carolco Studios, Inc.*, 355 N.C. 465, 473, 562 S.E.2d 887, 892 (2002)(citations omitted). When an act or conduct is done purposely and with knowledge that such act is a breach of duty to others, that is with a conscious disregard of the safety of others, it rises to the level of gross negligence. *Yancey v. Lea*, 354 N.C. 48, 53, 550

27

S.E.2d 155, 158 (2001). The court's foregoing excessive force and qualified immunity analysis establishes that a jury could find that Officer Bullock failed to act in a reasonably prudent manner when he tasered Plaintiff. Moreover, as the court explained in its analysis on Officer Bullock's entitlement to public official immunity, a jury could find that Officer Bullock's tasing of Plaintiff was done with a conscious disregard of the safety of Plaintiff. Accordingly, there is sufficient evidence to support Plaintiff's gross negligence claim. As this court previously has explained, a genuine issue of material fact exists as to whether Officer Bullock is entitled to public official immunity, so Plaintiff's gross negligence claim against Officer Bullock in his individual capacity may proceed.[10]

### 4. Punitive Damages

Plaintiff seeks to recover punitive damages from Officer Bullock in his individual capacity[11] for his claims for excessive force under § 1983 and his state law claims for assault and battery. Compl. [DE-3] ¶¶ 53, 68, 82, 88. Defendants contend Officer Bullock is entitled to summary judgment on the issue of punitive damages.

As Defendants note, "punitive damages are allowed in § 1983 claims only where the conduct 'involves reckless or callous indifference to the federally protected rights of others, as well as for conduct motivated by evil intent." Mem. in Support of Mot. for Summ. J. [DE-29] at p. 28 (quoting *Cooper v. Dyke*, 814 F.2d 941, 948 (4th Cir. 1987)). In order to obtain punitive damages for his state law claims, Plaintiff "must prove *by clear and convincing evidence* that the

---

[10] Again, Defendants have not moved for summary judgment on Plaintiff's claim for gross negligence against the City of Oxford.

[11] Plaintiff does not seek punitive damages against the City of Oxford.

28

wrongful conduct was accompanied by fraud, malice, or willful or wanton conduct." *Id.* (citing N.C. Gen. Stat. § 1D-15) (emphasis in original). Again, this court has determined that a genuine issue of material fact exists as to whether Officer Bullock's conduct was willful or wanton or demonstrated a reckless or callous indifference to Plaintiff. Accordingly, Defendant's Motion for Summary Judgment [DE-27] is DENIED as to Plaintiff's request for punitive damages.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [DE-27] is ALLOWED in part and DENIED in part. Plaintiff's Third and Sixth Claims for Relief are DISMISSED, as are any claims against Defendant Chief of Police John Wolford. In all other respects, Defendants' Motion for Summary Judgment is DENIED.

SO ORDERED.

This the 17th day of July, 2012.

James C. Fox
Senior United States District Judge

29